Filed 10/13/23  P. v. Hepburn-Martin CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>AVAILEK HEPBURN-MARTIN,<br><br>  Defendant and Appellant. | H049531<br>(Santa Clara County<br> Super. Ct. No. C1497284) |
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>MIGUEL CORNEJO,<br><br>  Defendant and Appellant. | H049539<br>(Santa Clara County<br> Super. Ct. No. C1497284) |

In 2017, a jury convicted Miguel Antonio Cornejo and his codefendant, Availek Hepburn-Martin, (collectively "appellants") of two counts of second-degree murder (Pen. Code, § 187, subd. (a)),[1] one count of assault with force likely to produce great bodily injury (§ 245, subd. (a)(4)), and one count of assault with a firearm (§ 245, subd. (b)).

---

[1] Unspecified statutory references are to the Penal Code.

The trial court sentenced both Cornejo and Hepburn-Martin to indeterminate terms of 55 years to life consecutive to determinate terms of seven years.

Appellants petitioned for resentencing under section 1172.6, alleging that their crimes no longer constituted second degree murder under 2018 amendments to the law relating to murder (Stats. 2018, ch. 1015, § l, subd. (f); § 189, subd. (e)(3)).[2] Following an evidentiary hearing,[3] the trial court denied their petitions after finding that appellants were guilty of implied malice second degree murder as either direct perpetrators or as aiders and abettors. On appeal, Cornejo and Hepburn-Martin challenge the sufficiency of the evidence to support the trial court's findings. We affirm.

## I.     FACTUAL AND PROCEDURAL BACKGROUND[4]

### A. Procedure

On April 7, 2016, the Santa Clara County District Attorney filed a first amended information charging Cornejo, Hepburn-Martin, and Tearri Richard with two counts of first degree murder (§ 187, subd. (a); counts 1, 2) and three counts of assault with a semiautomatic weapon (§ 245, subd. (b); counts 3, 4, 5). The information further alleged that, as to count 1, Cornejo and Hepburn-Martin personally used a firearm causing death

---

[2] Cornejo and Hepburn-Martin filed their petitions under former section 1170.95. Effective June 30, 2022, former section 1170.95 was renumbered to 1172.6 without substantive change. (Stats. 2022, ch. 58, § 10.) For clarity, we refer to the statute as section 1172.6.

[3] The petitions for resentencing were heard by the same judge who presided over the trial.

[4] This court granted Hepburn-Martin's requests for judicial notice of the record from the underlying trial (H046342) and a petition for writ of mandate filed by the District Attorney (H048945). The defendants' direct appeal from their convictions is currently pending in this court (H046342) and briefing in that case has been stayed pending resolution of the instant cases.

Our procedural and factual recitations are based on the transcripts from the underlying trial as well as the new evidence presented by way of stipulation at the section 1172.6 hearing. (See *People v. Clements* (2022) 75 Cal.App.5th 276, 292 (*Clements*).)

or great bodily injury (§ 12022.53, subds. (b), (c), (d)).  Finally, the information alleged as special circumstances that the murders (counts 1 and 2) were committed while the three defendants were engaged in robbery and burglary as well as that the three defendants had been convicted of more than one murder in this proceeding.  (§ 190.2, subd. (a)(17), (3).)

After a jury trial, Cornejo and Hepburn-Martin were found guilty of two counts of second degree murder (counts 1 and 2),[5] and one count of assault with a firearm (count 4).[6]  As to count 3, the jury found appellants not guilty of assault with a semiautomatic firearm but found them both guilty of the lesser included offense of assault with force likely to produce great bodily injury.  The jury acquitted appellants of the final count of assault with a semiautomatic firearm (count 5).  The jury also found true the allegation attached to count 1 that the two men personally discharged a firearm causing death or great bodily injury.  The trial court sentenced both Cornejo and Hepburn-Martin to indeterminate terms of 55 years to life consecutive to determinate terms of seven years.

### B.  Facts

#### 1.  The prosecution case

##### a.  Alejandro Solorzano's testimony

Solorzano sold marijuana for Bryan Lang by advertising on Craigslist.[7]  He would arrange for potential buyers to meet with Lang to complete the transaction.  Assuming they negotiated a high enough price, Lang would pay Solorzano a commission on the sale

---

[5] The jury found both defendants not guilty of first degree murder in counts 1 and 2 and consequently made no findings on the special circumstances allegations associated with the first degree murder charges.

[6] Richard was acquitted of all charges.

[7] Solorzano initially invoked his Fifth Amendment right against self-incrimination but testified after being granted use immunity.

of approximately $100 per pound. On average, buyers purchased around five pounds of marijuana from Lang.

A couple of days prior to the murders, Hepburn-Martin contacted Solorzano through Craigslist, and they arranged to meet at a restaurant in San Jose on the evening of September 23, 2014. The restaurant was across the street from Lang's home. Hepburn-Martin told Solorzano he owned a marijuana dispensary in Walnut Creek, and he was interested in purchasing five pounds of "Girl Scout Cookies"[8] for $10,000. Solorzano expected that he would make a $1,000 commission on the deal at that price. Although Solorzano told Hepburn-Martin that he had the Girl Scout Cookies strain available, he knew that Lang actually had a different strain of marijuana.

Solorzano met Hepburn-Martin in the restaurant's parking lot and walked with him across the street to Lang's house. Lang met them at the front door and the three men went to his bedroom. Lang's fiancée, Lisa Luna, was in the room working on her computer.

Lang brought out some samples of the marijuana, but Hepburn-Martin did not like them and asked if Lang had anything else. Lang left the room and returned with three or four more samples. Hepburn-Martin said he needed to show the samples to his associates.[9] Solorzano and Hepburn-Martin went outside and walked across the street carrying a small amount of marijuana to show to Hepburn-Martin's associates, Cornejo and Richard, who were waiting on the sidewalk. Cornejo indicated that they would take the marijuana even though they did not "love [the quality]." Solorzano and Hepburn-Martin walked back toward Lang's house. Lang was standing outside and Hepburn-Martin asked if it was all right if Cornejo and Richard came inside as well.

---

[8] This referred to a specific strain of marijuana.

[9] According to Solorzano, when he met Hepburn-Martin in the parking lot, Hepburn-Martin mentioned he had brought two friends with him who were waiting in his car.

Lang agreed, and all five men went back to Lang's bedroom. All of the bags of marijuana were on the bed and Lang said " 'Let's see the money.' " Either Cornejo or Richard handed a backpack to Hepburn-Martin, who reached inside and pulled out a black semiautomatic pistol. Hepburn-Martin pointed the weapon at Lang and said, " 'Give me all the weed.' "[10]

Lang said, "Ah, shit," and tried to twist the gun out of Hepburn-Martin's grasp. Solorzano said they struggled for 10 to 20 seconds before he heard a gunshot. Solorzano had his hands up, saying " 'Don't shoot me.' " Someone pistol-whipped Solorzano in the face, and he believed it was Hepburn-Martin since he was the only person Solorzano saw with a gun that night. Solorzano fell to the ground and someone wearing boots stomped on his face. Afterward, he saw one or two people running out carrying bags of marijuana.

Solorzano saw Luna grabbing at Lang and looking at his gunshot wound. She asked " 'What do I do' " and Solorzano told her to call the police. Luna had a mark on her face and Solorzano believed she had been pistol whipped as well. Solorzano left the house and met with his friends at a nearby pizzeria, then took a taxi to his friend's house. He put some ice on his face and spent a couple of hours watching television and checking Facebook.

### b. Lisa Luna's testimony

Luna had been dating Lang for seven years and frequently stayed at his house, though she did not live there. On September 23, 2014, she was in Lang's bedroom transferring photos from her phone onto her computer. She was not fully paying attention but heard Lang talking to someone on the phone. At some point, Luna became

---

[10] On cross-examination, Solorzano admitted that he had never previously told anyone, including police officers, that Hepburn-Martin made this demand on the night of the shooting. Solorzano further admitted that he "made up this . . . story of robbery, because it removes [him] from the situation."

aware that three or four other people had entered the bedroom with Lang though she was not focused on what the men were saying. When the tone of the conversation changed, Luna looked up from her computer. She saw the men were looking at marijuana on the bed and "they weren't happy with the way it smelled or something." Luna paid special attention to one man, whom she later identified as Cornejo, who was giving Lang "a tone attitude."

Lang sounded uncomfortable and said he did not understand why Cornejo was upset because he never claimed the marijuana "smelled a certain way." The other men in the room left, leaving Lang and Luna alone in the bedroom. Luna heard Lang, apparently looking at the monitor displaying the feeds for the security cameras outside the house, say " 'Why aren't they leaving? They're still here. . . . They're coming back.' " Luna saw Lang leave his bedroom for about 30 seconds, but then he came back in followed by Cornejo. Lang was walking backwards with his hands up, as if trying to push Cornejo out of the room or to push Cornejo's arms away from him. Luna saw that Cornejo was pointing a gun at Lang.

Luna heard a gunshot as Cornejo fired his weapon and she saw Lang's arms drop. Immediately after that shot, Luna was hit in the back of the head but she did not know who or what hit her.[11] Luna said that she was not aware anyone other than Cornejo and Lang were in the room with her. At the same time as she was hit in the head, Luna heard a second gunshot and thought perhaps she had been shot. She could only hear "faintly" and there was ringing in her ears. Luna fell to floor between the desk and the dresser. While on the ground, she heard three or four more gunshots.

---

[11] Luna was transported to the hospital by ambulance after the shooting for treatment of her head wound, which was "open and bleeding."

After her ears stopped ringing, Luna rolled over and saw Solorzano[12] standing by the bedroom door. Solorzano had blood all over his face and "looked like he was shocked." She then saw Lang on his hands and knees, fighting to breathe. Lang then collapsed onto his stomach. Luna looked at Solorzano because she was not sure who he was or what he planned to do, but he just left the room. Luna crawled over to Lang, rolled him onto his back, and tried to perform CPR. She called 911 and spoke to the dispatcher while trying to continue CPR. When she heard sirens, she went outside to direct first responders to Lang's bedroom.

In the hallway outside Lang's bedroom, Luna could hear Lang's mother, Diane, who was also on the phone with 911. Luna heard Diane tell the dispatcher that her husband had been shot and her son "was on the ground."

At the time of the shooting, Luna was not aware anyone else was in the room besides herself, Lang, and Cornejo. Cornejo was the only person that Luna saw with a gun that night. Cornejo's gun was chrome, and approximately seven to eight inches in length. In all, she heard four to five shots fired, but only saw Cornejo fire the first shot. Luna knew that Lang owned a chrome revolver at some point, which he kept on top of a piece of furniture near the front door out of sight. Luna did not know if he still owned that gun on the day of the shooting and denied seeing it near him when she was attending to him.

### *c*. *Diane Lang*'s *testimony*

On September 23, 2014, Diane, Lang's mother, was in her bedroom watching television with her husband, Keith, who had fallen asleep. She heard a thump. At first, she continued to watch television, but when she heard a second thump, she turned the volume down and listened. Diane heard a third thump so she muted the television and

---

[12] Luna testified she did not know Solorzano and had never seen him prior to that day.

7

went to Lang's bedroom door but did not hear anything. She tried to open the door, but it would not open, even though it had no lock. Diane threw herself at the door with her shoulder and the door flew open.

Inside, Diane saw a light-skinned Black man with a thin face, thin nose, and average build, approximately 5 foot 11 inches tall, holding a gun pointed at the floor. The man, whom Diane identified as Cornejo, looked straight at her. Diane described the gun Cornejo was holding as a black semiautomatic handgun approximately seven to eight inches in length. She glanced toward the bed but did not see Lang or Luna. Diane slammed the door shut and ran toward her bedroom, screaming at her husband, " 'He has a gun. Get up. He's got a gun. Get your gun.' "

Diane ducked into the hallway bathroom and jumped into the bathtub but realized she had no way to escape if Cornejo followed her. She left the bathroom and headed toward her bedroom again. She saw Keith in the doorway to the bedroom and heard a gunshot. Diane started to duck and kept running when she heard a second shot, saw a flash, and some plates on her dresser shattered. She ran around Keith and jumped into the bedroom closet.

Diane heard a third gunshot and came out of her bedroom. The front door to her house was open, and Keith was lying face down on the bathroom threshold. Diane called his name, but he did not respond. She ran to the kitchen to call the police and saw Luna and Lang on the floor of his bedroom.[13] Luna was trying to breathe into Lang's mouth. Diane called 911 and then ran back to Keith, but she could not tell if he was still breathing. She passed Lang, and saw he was turning gray, and heard Luna talking to 911 as well.

---

[13] After appellants fled her home, Diane returned to Lang's bedroom and saw him lying in the spot where she had previously seen Cornejo standing with his weapon pointed at the floor.

Diane heard a total of three gunshots in the house, and believed she heard two more gunshots outside, after she saw Keith lying on the floor. Before she originally came out from her bedroom to investigate the noises, she heard three thumps, all of which sounded like they came from Lang's bedroom.

### d. Police investigation

In gathering evidence at the scene, police discovered a fully loaded .357-caliber revolver beneath Lang's body. Police also found a fully loaded black .38-caliber revolver on the floor next to Keith's leg. Neither of these weapons had been fired and no other guns were found in the house.

Inside the home, police found a total of six shell casings and three spent projectiles. Five of the six recovered shell casings were found in Lang's room. Two of these casings were .380-caliber and three casings were .45-caliber. The sixth shell casing, also .45-caliber, was found on the living room floor directly across from Lang's bedroom.

One spent projectile, a .45-caliber bullet, was lodged in the wall behind Lang's bedroom door, approximately two feet above the floor. A second spent .45-caliber bullet was on the dresser in Diane's bedroom. That bullet had drywall material on it, and there was a strike mark on the wall of the hallway, which indicated the bullet ricocheted off that wall before continuing into the bedroom and landing on the dresser. The third spent projectile, also .45-caliber, was found underneath Keith's body. There was a bullet strike mark on the shower tile at a height of 4 feet 3 inches above the floor. Based on the strike mark and Keith's wounds, the bullet hit Keith in the chest, exited through his back, then struck the shower tile before falling to the floor. Two other projectiles, a .38-caliber copper jacket and a .45-caliber bullet, were recovered from Lang's body.

The two .45-caliber casings recovered from the threshold of Lang's bedroom and from the living room were consistent with the shooter firing down the hallway toward the bathroom and Diane's bedroom.

9

According to a ballistics and firearms expert, the four .45-caliber shell casings found in the Lang home were all fired from the same (.45-caliber) firearm and the two .380-caliber shell casings were fired from the same (.380-caliber) firearm. If the .45-caliber spent projectiles recovered at the scene were fired from the same firearm as the .45-caliber shell casings, the expert testified that the weapon used was a Glock .45 automatic colt pistol. The expert also opined that if the .38-caliber projectile found at the scene was fired from the same firearm as the .380-caliber shell casings, the firearm used was a .380 semiautomatic pistol.

Police found approximately 17 pounds of marijuana inside the house—7.5 pounds in Lang's room, and approximately 10 pounds in both the family room and living room. More marijuana was found in a drying room, and there were approximately 15 marijuana plants growing in the backyard.

### e. Autopsy evidence

Lang was shot three times from a distance of at least two to three feet and the cause of death was "multiple gunshot wounds." One .45-caliber bullet hit Lang in the upper back, caused trauma to his spine, lacerated his aorta and the left ventricle of his heart, traversed part of his left lung, then exited through the lower left side of his chest. Based on the bullet's trajectory and the fact that it was found lodged in the wall two feet above the floor, it appeared that Lang was either bent over or on his knees when the shot was fired. Due to the severity of the damage to Lang's heart, he would have collapsed and died soon after being hit by this bullet.

A second .45-caliber bullet struck Lang in his lower back on the right side, hitting his spine, his left adrenal gland, and left kidney before lodging in his lower left abdomen. The trajectory of this bullet was nearly horizontal from right to left and back to front. While the injuries from this shot were serious, they were not necessarily fatal. Due to the fact that more blood had pooled in Lang's chest cavity than in his abdomen, it appeared that the shot which entered his upper back preceded the shot that entered his lower back.

10

Based on the trajectories of both bullets, the shooter would have been positioned to Lang's right.

The third bullet, a .38-caliber, entered the left side of Lang's left thigh traveling from left to right. The bullet fragmented on the way, but it did not hit Lang's femur or major blood vessels and would not have been fatal in and of itself. Based on the trajectory, it was likely that the shooter was positioned on Lang's left side when he fired, but it was possible that, if the other two shots preceded this one, Lang might have spun around.

Lang also had two injuries, consistent with being struck by a firearm, on the top of his head. Lang's scalp was lacerated and his skull was superficially fractured which indicated that significant force was used. The blows could have caused Lang to collapse, become dazed or even concussed.

Keith was shot at least once, but not at close range, and the cause of death was determined to be "perforating . . . gunshot wound of the chest." The first injury was a bullet graze on his right hand. The second injury was where a bullet entered the left side of Keith's chest and went through his left lung, his aorta, and his right lung before exiting his right back. The trajectory of the bullet was front to back, left to right, and slightly upward. Although the injuries to Keith's aorta and lungs were fatal, he might have been able to take some steps before collapsing from blood loss. The bullet strike on the shower tile four feet three inches from the floor suggested Keith was standing when he was shot and the bullet hit the tile after exiting his body. It was possible that both the graze wound and the chest wound were caused by the same bullet, hitting Keith's hand first before continuing into his chest. Keith also had abrasions on his right knee and left forehead, which were consistent with him falling to the floor after being shot.

### 2. Defense case

Lang's brother, David, testified in codefendant Richard's case. On September 23, 2014, David was living at his parents' house and he arrived home from

work between 5:00 and 6:00 p.m. Diane, Keith, Lang, and Luna were all at home when he got there. After taking a shower and changing his clothes, David left the house around 8:00 or 9:00 p.m. As he was leaving, David saw four or five men standing near the front gate. Lang was standing by the front door and seemed a little nervous. David asked Lang, " 'Is everything okay?' " and whether he wanted David to stay because " '[t]hese guys are kind of fishy.' " Lang patted his hip and said he had things " 'under control.' " David saw that Lang had a .357 revolver tucked into his waistband. David assumed the men by the gate were there to buy marijuana from Lang.

Officer Rick Yu testified that, in 2005, he pulled Lang over for a traffic violation involving tinted windows. While Yu was writing the traffic citation, Lang got upset and said, " 'You're just a punk-ass Chinaman cop. Without that badge you ain't shit.' " Lang signed the citation and then said, " 'You [*sic*] punk-ass motherfuckers like you are the ones that need to get killed and shit. We'll meet again, motherfucker.' " As he said this, Lang made a gesture with his hand that simulated a gun shooting Yu. Yu arrested Lang for threatening a police officer and on the way to jail, Lang said, " 'Everyday someone dies. Their family member gets killed and shit.' "

### 3. *Final arguments and jury instructions*

After the close of evidence, the prosecutor argued that both Cornejo and Hepburn-Martin, as well as codefendant Richard, were guilty of first degree felony murder of both Lang and Keith as direct perpetrators or aiders and abettors. The prosecutor also argued that the defendants could be found guilty of (1) second degree malice murder of both Lang and Keith as direct perpetrators or aiders and abettors, and (2) the second degree murder of Keith under the natural and probable consequences theory as either direct perpetrators or aiders and abettors of the second degree murder of Lang.

The jury was instructed that it could find Cornejo and Hepburn-Martin guilty of Keith's murder under one of four theories: (1) as the actual killer; (2) as a direct aider and

12

abettor; (3) as an aider and abettor under the natural and probable consequences doctrine; or (4) under the first degree felony murder rule. The jury found both Cornejo and Hepburn-Martin guilty of the second degree murder of both Lang and Keith.

### C. *Petitions for resentencing*

On April 10, 2019, Cornejo and Hepburn-Martin filed separate petitions for resentencing under section 1172.6, alleging that the prosecution had proceeded on the theory that they were guilty of first or second degree felony murder, and they could no longer be convicted of first or second degree murder under the current law.[14] The trial court issued an order to show cause, finding that the petitions established a prima facie case for relief.

The parties stipulated to new evidence for the trial court's consideration in connection with the section 1172.6 hearing. The evidence consisted of certain postings on codefendant Richard's social media accounts, as well as messages and photos found on his cellphone, from both before and after the murders. The photos showed Richard holding various types of guns, and the text messages referred to weapons that Richard was trying to sell. In addition, Hepburn-Martin introduced evidence that, in 2019, Richard shot and killed someone during a road rage incident.

At the outset of the section 1172.6 hearing, the trial court presented the parties with an eight-page "rough written [s]tatement of [d]ecision[,]" asking the parties to review it and provide their thoughts "so that if I am obviously incorrect about something, I can fix it now rather than down the road when this matter gets reviewed." The district attorney pointed out the decision repeatedly used the phrase "probable cause" rather than "prima facie case" in discussing the initial threshold for scheduling an evidentiary hearing on a petition for resentencing under section 1172.6. The court responded, "I'm

---

[14] After the trial court issued an order to show cause on the petitions, the district attorney sought writ relief from this court. We summarily denied the district attorney's writ petition by separate order on May 10, 2021 (H048945).

old school and I tend to use old terms, but I'll change that now." At the conclusion of the hearing, the trial court stated, "The motions are denied" but made no reference to its written statement of decision as setting forth its findings and reasoning in the matter.

An unsigned copy of that decision has been made part of the record in Hepburn-Martin's case.[15] In that document, the court wrote that the People had proved beyond a reasonable doubt each element of implied malice second degree murder under current law and that both Cornejo and Hepburn-Martin were "guilty of implied malice murder in part as the actual perpetrator and in part as the aider and abettor." However, the decision still uses the phrase "probable cause" rather than "prima facie case," reflecting that this version of the document does not incorporate the modifications discussed at the hearing.

Cornejo and Hepburn-Martin filed timely notices of appeal.

## II. DISCUSSION

### A. Applicable legal principles

#### 1. Senate Bill No. 1437 and standard of review

Senate Bill No. 1437 (Senate Bill 1437) (2017-2018 Reg. Sess.) amended the Penal Code "as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § l, subd. (f); § 189, subd. (e)(3).)

As amended by Senate Bill No. 1437, section 188 provides in relevant part: "(a) For purposes of [s]ection 187, malice may be express or implied. [¶] (1) Malice is express when there is manifested a deliberate intention to unlawfully take away the life of

---

[15] By separate order dated May 19, 2022, we granted Hepburn-Martin's motion to augment the record to include the trial court's unsigned order. The Attorney General notes in its brief that a signed, final version of this document is not in the record in either Cornejo's or Hepburn-Martin's case.

a fellow creature. [¶] (2) Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. [¶] (3) Except as stated in subdivision (e) of [s]ection 189 [regarding the felony-murder rule], in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." Furthermore, as our Supreme Court has explained, "Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought." (*People v. Gentile* (2020) 10 Cal.5th 830, 848 (*Gentile*); see also *People v. Vang* (2022) 82 Cal.App.5th 64, 81; *People v. Ervin* (2021) 72 Cal.App.5th 90, 101.)

Defendants convicted of murder based on the felony murder rule or the natural and probable consequences doctrine prior to passage of Senate Bill No. 1437 can now petition for resentencing on the ground that they could not be convicted of murder under the current version of the law. (*People v. Lewis* (2021) 11 Cal.5th 952, 957.) Upon a petitioner's prima facie showing of entitlement to relief, the prosecution has the burden to establish, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under a legally valid theory. (§ 1172.6, subd. (d)(3).)

"Ordinarily, a trial court's denial of a section 1172.6 petition is reviewed for substantial evidence. [Citations.]" (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).) Thus, we examine the entire "record ' " 'in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant] guilty beyond a reasonable doubt.' " ' " (*Ibid.*) We review the "application of [that evidence] to the statute de novo. [Citation.]" (*People v. Silva* (2023) 87 Cal.App.5th 632, 639.) That the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment. (*People v. Thomas* (2017)

15 Cal.App.5th 1063, 1071 [defendant on substantial evidence review "bears an 'enormous burden' "].)

## *2. Theories of liability for second degree murder*

"Second degree murder is 'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.] Malice may be either express, i.e., when a defendant manifests an intention to kill, or implied. [Citation.] ' "Malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " ' [Citation.] Thus, implied malice includes an objective component—an act that is dangerous to life—and a subjective component—the defendant's awareness of and disregard for the danger." (*Clements*, *supra*, 75 Cal.App.5th at p. 299.) Intent to kill may be inferred from the defendant's acts and the circumstances of the crime. (*People v. Smith* (2005) 37 Cal.4th 733, 741.)

A person can be convicted of aiding and abetting second degree murder based on implied malice. (*Reyes*, *supra*, 14 Cal.5th at p. 990; *Gentile*, *supra*, 10 Cal.5th at p. 850 ["[N]otwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life."].)

An aider and abettor is a person who knowingly and intentionally encourages and aids a perpetrator in the commission of a criminal offense. (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.) In order to find a defendant is liable for an offense as an aider and abettor, the prosecution must prove the defendant's: (1) knowledge of the direct perpetrator's intent to commit the target offense; (2) intent to commit or assist in committing that offense; and (3) conduct that in fact assists in committing the offense.

16

(*People v. Perez* (2005) 35 Cal.4th 1219, 1225-1226; *People v. McCoy* (2001) 25 Cal.4th 1111, 1117-1118 (*McCoy*).) It is not sufficient that the defendant simply know that the direct perpetrator intends to commit the offense; rather, the defendant must also share that intent. (*People v. Beeman* (1984) 35 Cal.3d 547, 560; *McCoy*, *supra*, at p. 1118.) In deciding aider and abettor liability, the trier of fact may consider the defendant's " 'presence at the scene of the crime, failure to take steps to attempt to prevent the commission of the crime, companionship, flight, and conduct before and after the crime.' " (*People v. Garcia* (2008) 168 Cal.App.4th 261, 273.) "[I]mplied malice murder requires attention to the aider and abettor's mental state concerning the life endangering act committed by the direct perpetrator, such as shooting at the victim." (*Reyes*, *supra*, 14 Cal.5th at p. 992.)

"When two or more persons commit a crime together, both may act in part as the actual perpetrator *and* in part as the aider and abettor of the other, who also acts in part as an actual perpetrator." (*McCoy*, *supra*, 25 Cal.4th at p. 1120.) "The aider and abettor doctrine merely makes aiders and abettors liable for their accomplices' actions as well as their own. It obviates the necessity to decide who was the aider and abettor and who the direct perpetrator or to what extent each played which role." (*Ibid*.)

### B. *Hepburn-Martin's challenge to his conviction for Lang's murder*[16]

Hepburn-Martin argues that, based on the additional evidence presented at the section 1172.6 hearing,[17] the prosecution could not prove beyond a reasonable doubt that

---

[16] Cornejo concedes that his conviction for the second degree murder of Lang is not impacted by Senate Bill No. 1437's changes to the law of murder because the jury necessarily found that he was either Lang's direct killer or he directly aided and abetted Lang's murder.

[17] This evidence was twofold: (1) Cornejo admitted he used the .380-caliber weapon and shot Lang in the leg; and (2) Richard's social media posts and text messages before and after the shooting established that he owned a .45-caliber Glock handgun. In Hepburn-Martin's view, if Cornejo was armed with the .380-caliber that night and (continued)

he was guilty of the second degree murder of Lang. Following our de novo review of the evidence introduced at trial and the additional evidence presented at the section 1172.6 hearing, we disagree.

As detailed above, with respect to Lang's murder, the jury was instructed on two theories: first degree felony murder and second degree malice murder. The jury was not instructed that either Cornejo or Hepburn-Martin could be guilty of *Lang's* murder under the natural and probable consequences theory of liability.[18] The jury did not find either Cornejo or Hepburn-Martin guilty of the first degree felony murder of Lang but found them both guilty of his second degree murder.

Because the jury was not instructed that Lang's murder could be a natural and probable consequence of the defendants' actions, the only possible basis for the jury's verdicts was that it concluded that Cornejo and Hepburn-Martin killed Lang with malice aforethought. Murder based on actual malice, whether express or implied, remains a valid theory of liability under current law. (*Clements*, *supra*, 75 Cal.App.5th at p. 298 [Senate Bill No. 1437 "maintained the viability of murder convictions based on implied malice"].) As to count 1, it does not matter whether appellants acted as direct perpetrators of Lang's death or as aiders and abettors. "Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought." (*Gentile*, *supra*, 10 Cal.5th at p. 848.) Because Hepburn-Martin's conviction for the second degree murder of Lang was not affected by Senate Bill No. 1437's amendments to the law of murder, he could be

---

Richard owned a .45-caliber, it must have been Richard who shot and killed both Lang and Keith. However, no witness testified to seeing Richard actually holding a gun at Lang's house.

[18] As to count 2, however, the jury was instructed that appellants could be guilty of Keith's murder under this theory of liability.

18

convicted of that offense under current law and is therefore not entitled to relief under section 1172.6.

### C. *Substantial evidence supports appellants' convictions for the second degree murder of Keith*

As to Keith's murder, Hepburn-Martin reiterates the argument he made as to count 1, namely that the additional evidence presented at the section 1172.6 hearing means that he could not be convicted of Keith's second degree murder under current law. He further argues the trial court improperly conflated the concepts of liability as an "actual perpetrator" and as an "aider and abettor" in its unsigned order denying his petition.

Cornejo argues that, because a person can no longer be convicted of murder under the natural and probable consequences theory of liability, his conviction for the second degree murder of Keith must be vacated because there was not sufficient evidence to show that he was Keith's actual killer or that he directly aided and abetted the actual killer. Cornejo challenges his liability as an aider and abettor to Keith's murder asserting that "Keith Lang's murder was the result of a sudden, unforeseen circumstance," and thus he could not know "the shooter intended to shoot Keith" nor did he "aid the shooter in doing so." Again, we disagree.

### 1. *Appellants acted with malice*

The evidence here supports the trial court's finding that appellants not only killed Lang and Keith but did so with malice. Lang was shot with two different guns. Solorzano testified that Hepburn-Martin was the person who first shot Lang as they struggled over Hepburn-Martin's gun. According to Luna, it was Cornejo who held Lang at gunpoint before shooting him. Diane testified that when she forced her way into Lang's bedroom, she saw Cornejo standing in the room with a handgun pointed toward the floor where Lang's body was later discovered.

19

Lang was shot three times, once with a .380-caliber weapon and twice with a .45-caliber weapon.[19]  Although Lang's leg wound, inflicted by the .380-caliber gun, was not a fatal injury, whoever fired that shot aided and abetted the person armed with the .45-caliber weapon in killing Keith or acted as a direct perpetrator of implied malice murder.  The shot to Lang's leg made it more likely that all the defendants would be able to escape the premises without resistance.  Furthermore, while the leg wound was not fatal,[20] it is not clear if that was a matter of happenstance or by design.  As supported by the testimony of Solorzano, either the .380-caliber or .45-caliber gun could have been fired by Hepburn-Martin as he fought with Lang.  It was equally plausible that the fact-finder concluded that either the .380-caliber or .45-caliber gun was fired by Cornejo, as supported by the testimony of Luna and Diane.

In any instance, the evidence clearly showed that appellants were acting in concert.  They arrived at Lang's house together, made no effort to stop each other from shooting at Lang, Diane, and Keith, and ran off to their car together.

Keith was shot and killed by the person wielding the .45-caliber gun, but it makes no difference if that person was Hepburn-Martin or Cornejo.[21]  The other person, who did

---

[19] Fragments from a .380-caliber bullet and an intact .45-caliber bullet were recovered from Lang's body, and a second .45-caliber bullet passed through him and was discovered lodged in the wall of his bedroom.

[20] The medical expert testified that the bullet missed Lang's femoral artery but had it not, Lang would have bled to death.

[21] Hepburn-Martin argues that Richard owned a .45-caliber Glock handgun and, since Cornejo admitted to using the .380-caliber gun that night, Richard must have killed Keith. Based on our review of the evidence presented at trial, it is not entirely clear who shot Lang with the .380-caliber gun and, like the trial court, we are not required to accept Cornejo's self-serving admission that it was him.  (See *People v. Curtis* (1951) 104 Cal.App.2d 219, 223 [trial judge is not required to accept as true sworn testimony or affidavit of a witness, even in the absence of evidence contradicting it].)  Even assuming for the sake of argument, that Richard owned a .45-caliber firearm, we are also not required to conclude, based on indirect and circumstantial evidence, that Richard was (continued)

not shoot at Keith, could still be found guilty beyond a reasonable doubt as an aider and abettor of implied malice murder. The person who shot Lang with the .38-caliber handgun arrived at Lang's house armed with a weapon, which he then used to shoot Lang, either before or after Diane burst into Lang's bedroom. After seeing Cornejo holding a firearm, Diane ran back down the hallway, calling out for Keith to get his gun. Appellants, who had already shot Lang (or would shoot him immediately after Diane fled the room), were therefore alerted that they would soon be confronted by an armed person and that escaping the house would require shooting that person as well. Thus, a reasonable factfinder could conclude that each of the appellants intended to commit a life-endangering act, i.e., shooting anyone coming toward them as they fled, and intended to aid each other in doing so.

### 2. *Reliance on excerpts from trial court's proposed order*

Appellants' challenges to the sufficiency of the evidence supporting the trial court's unsigned decision are based on selective quotes from the proposed statement of decision. Before addressing those challenges, we first consider the legal effect, if any, we should ascribe to an unsigned, unfiled tentative decision.[22] Section 1172.6 offers no

---

armed with a .45-caliber weapon that night. No one testified that they saw Richard carrying or using a weapon in Lang's house. While Solorzano may have testified that he made up the story about appellants robbing Lang, he did not retract his testimony that he saw Hepburn-Martin holding a firearm *and* shooting Lang as the two men fought over that weapon.

[22] In the civil context, " 'a court is not bound by its statement of intended decision and may enter a wholly different judgment than that announced.' [Citation.]" (*In re Marriage of Ditto* (1988) 206 Cal.App.3d 643, 646-647.) While a section 1172.6 evidentiary hearing is not a civil proceeding, the trial judge expressly informed the parties that it intended to modify the written statement following the hearing, yet no modified version of the document, let alone one that was signed by the judge and filed by the clerk, appears in either Cornejo's or Hepburn-Martin's record below.

guidance on this question, because the statute does not require that the court provide a statement of its reasoning following an evidentiary hearing.[23]

We are mindful that " '[i]n a criminal bench trial, the trial court is not required to provide a statement of decision and . . . any explanation of his or her decision a trial judge provides is not part of the record on appeal. [Citation.]' [Citation.]" (*People v. Dawson* (2021) 69 Cal.App.5th 583, 592.) However, on appeal, " 'we may nonetheless consider a judge's statement when, *taken as a whole*, the judge's statement discloses an incorrect rather than a correct concept of the relevant law, "embodied not merely in 'secondary remarks' but in [the judge's] basic ruling." [Citations.]' [Citation.]" (*Ibid.*)

To be clear, "[a] petition under . . . section [1172.6] is not a criminal prosecution. [Citation.]" (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 588.) While a section 1172.6 evidentiary hearing is not the *same* as a criminal bench trial, there are similarities. In both, the trial court sits as a finder of fact and evaluates whether the People have met the applicable burden of proof under the statute. (See *People v. Subia* (1966) 239 Cal.App.2d 245, 249 [in bench trial, judge is sole finder of fact]; *Clements*, *supra*, 75 Cal.App.5th at pp. 296-297 [in section 1172.6 hearing, trial court acts as the finder of fact when determining whether the prosecution has met its burden beyond a reasonable doubt].)

Given the similarities in the court's roles and the lack of requirement for the trial court to provide a statement of decision in either, we do not believe it is necessary to employ a different standard when determining whether and how to consider a trial court's purported statement of decision following a section 1172.6 evidentiary hearing. Appellants offer no reason to apply a more stringent standard. Accordingly, we only consider the trial court's statement to the extent it "discloses an incorrect rather than a

---

[23] A statement of decision is only required where the trial court declines to issue an order to show cause on a petition for resentencing. (§ 1172.6, subd. (c).)

22

correct concept" of the law. (*People v. Tessman* (2014) 223 Cal.App.4th 1293, 1302 (*Tessman*).) This is in accord with the well-established principle that we review the legal correctness of the court's ruling, not the court's rationale. (*People v. Zapien* (1993) 4 Cal.4th 929, 976 (*Zapien*).)

### 3. The trial court did not misapprehend the law of implied malice murder

In this case, the statement of decision, at best, reflects the trial court's views *prior to the hearing*. Even assuming we could consider the statements excerpted by appellants, our review of the unfiled and tentative written statement of decision along with the transcript of the evidentiary hearing, does not "disclose[] an incorrect . . . concept" of the law regarding implied malice murder. (*Tessman*, *supra*, 223 Cal.App.4th at p. 1302.)

Cornejo claims that, because he admitted that he was the person who fired the .380-caliber gun, he cannot be held liable for Keith's murder as the actual killer or as an aider and abettor. As a threshold matter, given that Cornejo failed to augment his record on appeal with the trial court's tentative statement of decision, he is precluded from relying on that document to support his argument.

However, assuming we were to credit the trial court's acceptance of Cornejo's admission that he shot Lang with the .380-caliber gun as set forth in the tentative statement of decision, and discussed *ante*, the evidence was sufficient to support Cornejo's guilt as an aider and abettor of implied malice murder as to Keith. A reasonable factfinder could conclude that both Cornejo and Hepburn-Martin acted in concert at Lang's house that evening, and the prosecution presented evidence sufficient to show, beyond a reasonable doubt, that each of them were guilty of the second degree murder of Keith as either direct perpetrators or as aiders and abettors.

Hepburn-Martin argues the trial court erred when it wrote in the proposed order that he could be found guilty of murder "in part as the actual perpetrator and in part as the aider and abettor." Again, even if were to take into account the trial court's statement of decision, that document does not set forth an incorrect statement of the law as to implied

23

malice murder. The court was quoting directly from the California Supreme Court's opinion in *McCoy*, *supra*, 25 Cal.4th 1111, discussing how "the dividing line between the actual perpetrator and the aider and abettor is often blurred." (*Id*. at p. 1120.) "It is often an oversimplification to describe one person as the actual perpetrator and the other as the aider and abettor. When two or more persons commit a crime together, both may act in part as the actual perpetrator *and* in part as the aider and abettor of the other, who also acts in part as an actual perpetrator." (*Ibid*.)

"To understand aiding and abetting an implied malice murder, one must understand the analytical connection between *the act* or the actus reus and the mens rea elements of direct aiding and abetting liability and the actus reus and mens rea elements of implied malice murder." (*People v. Powell* (2021) 63 Cal.App.5th 689, 712.) "Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life." (*Id*. at p. 713, fn. omitted.)

Here, Cornejo and Hepburn-Martin entered Lang's home in order to purchase a large quantity of marijuana. Substantial evidence supports the conclusion that both men were armed when they arrived. Once Diane came into Lang's room and saw Cornejo standing there with a gun, she called out for Keith to get his own gun. At that point, appellants knew: (1) another person in the house was armed; and (2) that armed person would be coming to confront them. Shooting and killing Lang eliminated him as a possible impediment to their escape, and it is reasonable to conclude that appellants knew getting away would also require shooting anyone who tried to stop them. In this case, after being alerted by Diane, the person who tried to stop them was Keith. Regardless of

24

who actually shot and killed Lang, a reasonable factfinder could conclude that that act aided in the subsequent fatal shooting of Keith as appellants fled the house.

In this case, substantial evidence supports the trial court's decision that the prosecution proved beyond a reasonable doubt that both Cornejo and Hepburn-Martin were guilty of second degree murder of both Lang and Keith.

### III. DISPOSITION

The orders denying Cornejo and Hepburn-Martin's petitions for resentencing under Penal Code section 1172.6 are affirmed.

_____
Wilson, J.

WE CONCUR:


_____
Danner, Acting P.J.


_____
Bromberg, J.


H049531
*People v. Hepburn-Martin*
H049539
*People v. Cornejo*